NOTICE
Decision filed 11/20/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250525-U

NO. 5-25-0525

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* LILLY G., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Effingham County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 19-JA-23 |
| | ) | |
| Skylar G., | ) | Honorable |
| | ) | Allan F. Lolie, |
| Respondent-Appellant). | ) | Judge, presiding. |

PRESIDING JUSTICE McHANEY delivered the judgment of the court.
Justices Boie and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's judgment terminating respondent's parental rights was not against the manifest weight of the evidence where the State met its burdens of proving that the respondent was unfit to parent and that termination was in the best interest of the minor. Therefore, the judgment of the circuit court is affirmed.

¶ 2    The respondent, Skylar G., appeals from the May 27, 2025, order of the circuit court terminating his parental rights over his minor daughter. On appeal, respondent challenges both the finding of unfitness and the determination that it was in the minor's best interest to terminate his parental rights. For the reasons explained below, we affirm.

1

¶ 3                              I. BACKGROUND

¶ 4     This case began on April 24, 2019, when the State filed a petition for adjudication of wardship and motion for temporary custody regarding respondent's minor child, Lilly G., who was born in February 2019. The petition named the respondent father and the minor's mother, Cherese W.[1] The State alleged that Lilly was neglected and abused by reason of not receiving proper medical care or adequate food pursuant to section 2-3(1)(a) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(a) (West 2018)). In support of its allegation, the State indicated that between February 8, 2019, and April 15, 2019, the minor failed to gain an adequate amount of weight, and on April 15, 2019, she was hospitalized for failure to thrive based on poor weight gain. The State further alleged that the minor's failure to thrive was caused by both parents' failure to adequately feed her.

¶ 5     The circuit court entered a temporary custody order the same day, and appointed a Court Appointed Special Advocates (CASA) representative for the minor. In its temporary custody order, the court found that probable cause existed for the allegations in the State's petition, and there was an immediate and urgent necessity to remove the minor from the home. The permanency goal was set for return home within 12 months.

¶ 6                     A. Adjudication of Neglect and Initial Proceedings

¶ 7     In May 2019, the Department of Children and Family Services (DCFS) filed a visitation plan for weekly supervised visits in the home. Caritas Family Solutions (Caritas) filed a court report on May 17, 2019, which indicated that on the report date of February 8, 2019, the parents were homeless and living in a cold, run-down hotel, and the minor had reportedly gone three days

---

[1]The circuit court terminated Cherese's parental rights on February 8, 2023. She is not a party to this appeal, and will be mentioned only where relevant.

2

without food and did not have clothing. Neither parent had any reported support from their respective families. DCFS filed a family service plan and an integrated assessment in July 2019. DCFS stated that respondent was unemployed, and that he reported he was bipolar and paranoid. Respondent also reported that he was not engaged in mental health services, and was "supposed to be on medication," but was no longer taking it. DCFS assigned the following services to respondent: parenting courses; compliance with the recommendations of the integrated assessment; appropriate and stable housing, as measured over a six-month period; maintenance of a legal income and timely payment of bills and other necessary expenses; and a mental health assessment.

¶ 8 The circuit court held an adjudicatory hearing on December 4, 2019. Respondent stipulated to the State's allegation that the minor's failure to thrive and gain weight was the result of his failure to adequately feed her. The court entered an adjudicatory order the same day, finding by a preponderance of the evidence that the minor was neglected by both parents because she "suffer[ed] from a lack of support, education, [and/or] remedial care" pursuant to section 2-3(1)(a) of the Juvenile Court Act (*id.*). The court set the matter for a dispositional hearing.

¶ 9 CASA filed a report in January 2020, stating that the minor was doing well living in her foster home, that neither parent was progressing on their service plans in a timely manner or had steady employment, and that respondent had "only recently" contacted his caseworker to get involved in the case. CASA recommended that custody and guardianship of the minor remain with DCFS and Caritas, and that the minor remain in her current foster placement. Caritas also filed a dispositional court report that month, noting that respondent had reported that he had separated from the minor's mother in December 2019 and was living with his girlfriend. A caseworker conducted a home safety check that month, at which time she explained to respondent the services

3

he still needed to complete. Respondent was no longer engaged in parenting classes, so he was re-referred to services on January 13, 2020. He began mental health counseling on January 6, 2020. He had not engaged in domestic violence services. Respondent was unemployed and looking for work.

¶ 10                          B. Permanency Review

¶ 11    The circuit court entered a dispositional order on January 29, 2020. The court found that the parents were unable and unwilling to appropriately parent the minor, adjudicated the minor to be neglected, and made the minor a ward of the court. In March 2020, Caritas filed a status report, which modified visitation to video chat due to the COVID-19 pandemic. The court also set a hearing date of July 15, 2020, for the initial permanency hearing. Following the hearing, the permanency goal was established as return home within 12 months.

¶ 12    In March 2021, Caritas filed a permanency report, stating that respondent continued to be employed and have housing, and his service plan remained unchanged, consisting of mental health treatment and classes on parenting and domestic violence. Respondent's counselor informed Caritas on February 19, 2021, that she would be successfully discharging him from mental health services. However, Caritas expressed concern that he may need more extensive care, given his mental health history. His counselor reported that he had met the goals he wanted to meet, and self-reported that he was doing well. Caritas stated in its report that it was requesting for respondent to undergo a psychological evaluation to ensure that all mental health concerns were properly addressed.

¶ 13    Caritas further reported that respondent began engaging in domestic violence services in February 2021, and the agency had received satisfactory reports about his progress. In January 2021, Family Life Center reported that respondent would need to restart parenting classes in order

4

to receive a certificate of completion. Since then, respondent had done so, and he completed parenting services in February 2021. Caritas received a copy of his certificate. Regarding visitation, respondent remained inconsistent in visiting the minor. Despite his recent results, Caritas expressed concern with respondent's overall inconsistent engagement with services, his visitation, and a July 2020 domestic violence incident that took place between respondent and his girlfriend.

¶ 14    On March 31, 2021, the circuit court held another permanency review hearing, at which the State reported that respondent had begun to engage in services, and requested that the permanency goal remain at return home and respondent be given time to continue his services. The circuit court entered a permanency order on April 1, 2021, repeating the findings of its previous order.

¶ 15    In a May 2021 report, Caritas wrote that after completing mental health counseling, respondent still needed to be evaluated by a psychiatrist. Caritas was concerned about respondent's admission that he was not willing to take medication. Respondent continued to make progress on his domestic violence services. He also remained inconsistent with visitation, and did not regularly bring food for the minor as he was instructed to do. Caritas wrote that respondent needed to provide the necessities for the minor during visits. Caritas indicated that respondent's overall progress was "minimal" and did not support a rating of satisfactory progress.

¶ 16    CASA filed a report in August 2021, which stated that the minor had been in her foster home since she was seven months old, and she was now two years old. The minor continued to thrive in the home, and was attached to her foster family. CASA also indicated that in June and July of 2021, the foster mother reported that respondent had not been providing the minor with anything to eat or drink during his visits, and he never changed her diaper. The minor often had a

5

wet diaper after her visits with respondent. Respondent also did not always appear for visitation. CASA noted concern regarding both respondent's inconsistent visitation and the lack of timeliness in progressing on his service plan.

¶ 17 Caritas filed a court report in September 2021 in advance of the next permanency review hearing. After starting to engage in domestic violence services in February 2021, respondent met the criteria for discharge on August 13, 2021. Regarding visitation, the report indicated that Caritas had attempted to accommodate respondent's work schedule on multiple occasions, after he stated that he was missing visits due to work. However, his attendance did not improve, and he missed the last two visits as of the September 2, 2021, report. Additionally, when he did attend visitation, he often failed to bring the necessities that he was supposed to provide for the minor, such as food and diapers. Caritas further wrote that respondent did not interact with the minor during visits, instead letting his girlfriend do most of the interaction. Respondent's girlfriend was engaging in parenting services, but was unemployed and had not engaged in mental health or domestic violence services.

¶ 18 At the September 8, 2021, hearing, the circuit court adopted the State's recommendation of keeping the permanency goal at return home, and reserved hearing further arguments until the State filed its petition to terminate parental rights. It also filed a permanency order that again found that respondent had not made reasonable and substantial progress toward returning the minor home and made no finding regarding reasonable efforts.

¶ 19 The State filed a motion for termination of parental rights as to both parents on September 17, 2021. Regarding respondent, the State alleged that he was an unfit person pursuant to section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2020)) and section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)) due to his failure to maintain a reasonable degree

6

of interest, concern, or responsibility as to the minor's welfare between January 29, 2020, and October 29, 2020, as well as his failure to make reasonable efforts or progress towards correcting the conditions that led to the minor's removal, over the same nine-month period. The State further alleged that it was in the minor's best interest that the parents' rights be terminated and that she be placed in the guardianship of DCFS for adoption. The circuit court set a date of February 8, 2022, for a fitness hearing.

¶ 20                                    C. First Fitness Hearing

¶ 21     At the February 8, 2022, fitness hearing, the State argued that respondent did not make progress on his three primary services of parenting, domestic violence, or mental health during the nine-month period between January and October 2020. It further argued that he missed approximately 40% of his visits with the minor, which demonstrated that he did not maintain a reasonable degree of interest in her during this time. Counsel for respondent argued that respondent has consistently shown that he can maintain appropriate housing and employment, that he completed parenting and domestic violence services, and that he completed all mental health services required of him in 2020, before the additional evaluations were added in 2021.

¶ 22     The circuit court took the matter under advisement. On April 6, 2022, the court announced its ruling, finding that the State had not met its burden of proving by clear and convincing evidence that respondent was unfit to parent. The court then set the matter for a best-interest hearing regarding the mother, who the court did find to be unfit, and further permanency review regarding respondent.

¶ 23     CASA filed a report in April 2022, which noted continued concern over respondent's visitation attendance. Caritas filed a report in October 2022, stating that respondent had not completed the forms required for his psychological evaluation. Respondent reported that he was

still employed, but he had not provided the agency with a paystub. CASA filed another report that same month, noting that respondent had missed at least nine visits since May 2022, and that his one-hour-per-week visits were insufficient for him and the minor to develop a bond for the goal of return home. Caritas filed a report on January 26, 2023, marking him satisfactory on parenting and domestic violence, but unsatisfactory on cooperating with the agency, mental health, housing, and income. The report indicated that while he was generally responsive with his caseworkers, he had been told that he still needed to provide them with proof of housing and employment and had not done so. He also did not show up to his scheduled psychological evaluation for the second time, and was unresponsive when his current caseworker tried to reach out and reschedule it with him. His unsatisfactory rating for mental health was still due to the missing evaluation; however, he did complete the psychiatric assessment and was prescribed a new sleeping medication. His housing and income requirements were unsatisfactory because of the aforementioned failure to provide the agency with copies of his lease agreement and monthly payments as to the former, and paystubs as to the latter, despite being asked to do so several times. Lastly, out of the last 19 scheduled visits with his daughter, respondent attended 12 and missed 7.

¶ 24    On February 8, 2023, the circuit court held a hearing for the best-interest portion of the mother's termination proceedings and a permanency review for respondent. At this hearing, the court admonished respondent that he needed to provide his caseworker with everything identified in the last permanency report and cooperate with his caseworker to complete his service plan. The court entered a permanency order that day, finding that respondent had made neither reasonable and substantial progress nor reasonable efforts towards the return of the minor.

¶ 25    Caritas's March 2023 report stated that respondent began a psychological evaluation at the end of February, but was still rated unsatisfactory for mental health services, as he had not

8

completed the evaluation. Respondent had provided paystubs since the last report and was satisfactory as to income; however, he was still unsatisfactory on housing, as he had not provided the previously-mentioned required documentation. Regarding visitation, the report stated that when respondent attended visitation, he was late.

¶ 26    Respondent underwent his required psychological assessment on February 28 and April 2, 2023, and the report was filed with the court on April 17, 2023. According to the report, respondent showed signs of an unspecified depressive disorder and borderline personality disorder, and also had a history of severe trauma, which could impact his mental health if he did not maintain therapeutic services. The evaluation also included a parenting capacity assessment, at which he admitted that he lacked appropriate models of positive parenting and had difficulty getting his children to do something. In an observation of respondent's interactions with the minor, respondent's communication was appropriate, he possessed a basic understanding of and ability to meet her needs, and the minor appeared comfortable with her father. The report concluded that respondent should continue to engage in therapy and psychiatric monitoring and would benefit from further coaching on his parenting skills if the minor were to be returned home.[2]

¶ 27    On April 26, 2023, the guardian *ad litem* (GAL) filed a motion to suspend visitation. In her motion, she stated that the minor's foster mother, Sarah Stock, had expressed concerns about respondent. Specifically, she noticed that the minor displayed certain negative behaviors following visits with her father, such as having diarrhea for a few days after his visits; pinching, biting, and kicking other children at daycare; and screaming, throwing things, and not listening at home. Stock

---

[2]From this point forward, the court reports discussing respondent's service plan updates refer to this further mental health treatment and parenting education as additional services, sometimes separate from respondent's prior mental health and parenting service plan requirements. The reports acknowledge that respondent completed the mental health counseling and parenting classes originally assigned to him, but he was now required to address both of these areas as per the recommendations of the psychological evaluation.

stated that these behaviors do not occur on any other occasions, and that it usually takes the minor several days to "recover" after a visit with her father. Stock added that the minor's doctor and her daycare expressed similar concerns. The GAL wrote that she had reviewed respondent's visitation notes, and his behavior appeared to be appropriate; however, the notes indicated that the minor did not wish to hug or touch her father, and she appeared to have little to no bond with him. Given these concerning behaviors, as well as the length of time that the minor had been in care, the GAL concluded that it would be in the minor's best interest for the court to temporarily suspend visitation.

¶ 28    On May 31, 2023, the State filed a second motion for termination of parental rights, arguing that respondent had failed to make reasonable progress or efforts towards the return of the minor during the following nine-month periods: (1) March 1, 2020, to December 1, 2020; (2) July 1, 2021, to April 1, 2022; and (3) April 30, 2022, to January 31, 2023. On the same date, the circuit court held a hearing on the GAL's motion. At the hearing, the State informed the court that it was joining the motion as well.

¶ 29    The GAL argued that the minor's troubling behavior began when respondent started attending visitation more frequently, and that while the GAL did not have any concerns about respondent's behavior during visits, she believed that the minor was experiencing some kind of trauma associated with the visits. Stock, the minor's foster mother, testified on behalf of the GAL, and spoke of the same issues regarding the minor's behavior that the GAL alleged in her motion.

¶ 30    Respondent testified about the positive interactions he had with the minor during his visits, and spoke of the bond they shared. He stated that he believed she enjoyed her time with him, and with her younger half-brother. Respondent's counsel argued that the evidence did not establish that the minor's reactions were triggered by her father's visits, and correlation did not mean

10

causation. Counsel further argued that the evidence showed that respondent and the minor had a deep bond.

¶ 31    The State argued that the supervisor notes from respondent's visitation supported Stock's testimony more than respondent's, and that the four-year-old minor was not capable of voicing the complex emotions that were brought forth by respondent's visits. The circuit court then stated that it had reviewed respondent's psychological evaluation and parenting capacity assessment, which established that respondent's visits with the minor go well, and that she enjoys them. The court agreed with respondent's counsel that the minor's problems could have some other cause. The court denied the GAL's motion to suspend visitation but stated that its ruling had no bearing on whether the court would grant the State's motion to terminate parental rights.

¶ 32    In August 2023, CASA filed a report in advance of the fitness hearing on the State's second motion. The report indicated that respondent continued to miss visits, and had not attended any visits that July. His visitation was still set at one hour a week, which was "not enough for them to grow a bond, if return home is the goal." The minor was bonded with the foster family. Respondent's girlfriend still had not completed her own service plan, which was implemented when respondent began living with her, and this was a barrier to the minor's ability to live with respondent while he continued to live with her. The girlfriend also recently had a second child.

¶ 33    Caritas also provided a report that month on respondent's service plan. He was rated unsatisfactory on mental health because the psychological evaluation indicated that he needed further treatment for his mental health and additional parent coaching. Respondent was rated satisfactory on all other services. Regarding visitation, between September 2022 and August 2023, he was scheduled to attend 37 visits; he missed 8, including the last 3 consecutive visits. Respondent's girlfriend was rated satisfactory on housing and income, the latter coming from

respondent's income as she was unemployed. She was rated unsatisfactory on all other services, including visitation.

¶ 34                                    D. Second Fitness Hearing

¶ 35    The circuit court held a second fitness hearing on the State's new motion to terminate parental rights on August 15, 2023. At this hearing, respondent's counsel made an objection regarding the State's use of the nine-month period from March 1 through December 1, 2020, in its second motion, as this heavily overlapped with the period specified in its first motion—January 29 through October 29, 2020—and the court had denied that motion as to respondent. The circuit court agreed, and ruled that the State was barred by *res judicata* from repeating its argument regarding respondent's progress and efforts in the months previously ruled on and rejected by the court. The court reset the matter for the State to file an amended petition.

¶ 36    The State amended its motion three times; its third amended motion was filed on July 24, 2024, and alleged that respondent failed to make reasonable efforts or progress towards the return of the minor between May 15, 2023, and February 15, 2024. Prior to the fitness hearing on the third amended motion, CASA filed a report in October 2023, which stated that respondent and his girlfriend had broken up, and as of September 2023, respondent was living alone. Respondent had "missed over 7 straight visits the past month and a half," suggesting that he was not showing interest in his visits with his daughter. CASA further noted that there did not seem to be a strong bond between respondent and the minor; on one occasion when respondent did not show up for a visit, the minor stated to a case aide that she was glad, "because she doesn't like doing visits with him."

¶ 37    Caritas also filed a report that month, rating respondent satisfactory on housing, domestic violence, and parenting, and unsatisfactory on income, mental health, and visitation. Respondent

reported that he was employed, but Caritas wrote that he could not be deemed satisfactory as he had failed to provide paystubs. Regarding mental health, respondent had yet to do the parenting capacity assessment recommended in his psychological evaluation, and he said he did not want to get back on medication. Caritas noted the same issues as the CASA report regarding his visitation. Caritas summarized that respondent had made "minimal progress over the last three years," and made "just enough efforts to just make it appear as if he is making progress." The biggest concerns were his visitation and need for continuing mental health treatment, including following through with taking previously prescribed medication and participating in parent coaching.

¶ 38    The circuit court held a hearing on July 24, 2024, on the State's third amended motion to terminate parental rights. Ami Rubin, a Caritas caseworker, testified for the State. She stated that when she took over respondent's case, he was on a service plan created in October 2023. His services were mental health and psychological services, domestic violence, parenting, housing, and income. Rubin testified that respondent had recently moved when she took over his case at the start of 2024; the agency conducted a home safety check of his new apartment, and it did not pass. Respondent was also rated unsatisfactory on income, as he was unemployed when Rubin first got his case. He found work at the end of January but lost it two weeks later. Respondent was satisfactory on domestic violence services, but while he had completed the earlier parenting classes in 2021, he still had to complete additional parenting services resulting from the recommendations of his April 2023 psychological evaluation. Rubin further testified that respondent was unsatisfactory on mental health and psychological services, as he had quit attending mental health services, and had to be asked to reengage. In January and February of 2024, he had not reengaged in these services. Rubin explained that after he underwent the psychological evaluation, respondent was required to maintain mental health counseling and complete further parenting education.

13

¶ 39    When asked about visitation, Rubin explained that the policy for determining whether a parent's visitation would be extended or increased required the parent to achieve consistency in his visits and to stay engaged in services. In January and February of 2024, respondent did not achieve consistency that would afford him additional visitation time. After January and February, respondent's 2024 visits remained inconsistent. Rubin explained that respondent had to call in and confirm each visit by 1 p.m. the day prior, or else the visit would be cancelled. Respondent would often either miss the call-in window or fail to call at all.

¶ 40    Rubin added that respondent did not discuss getting additional parenting time with her until the very end of her time on his case. She further testified that if he had made more progress on his service plan, he might have received more visitation time; however, she acknowledged that "[a]t the very end [of her time on the case] he absolutely had progressed."

¶ 41    Rubin testified that she had spoken with respondent about where he stood and what he still needed to do on his service plan, and offered him providers with whom he could complete those services. However, he made no significant progress on either visitations or mental health during her time on the case, and had no response for her during these conversations. Furthermore, because he had stopped engaging in services, Rubin explained that the agency required new consent forms from him in order to get him back into mental health and parenting services; respondent never provided consent forms for either.

¶ 42    Respondent's counsel then argued that there were no court reports filed that covered the nine-month period identified in the State's third amended motion, May 15, 2023, through February 15, 2024. The circuit court reset the matter so that the relevant reports could be filed, and for all parties to have time to review them.

¶ 43    The next portion of the termination proceedings took place over three days—October 2, 2024, October 22, 2024, and January 13, 2025. During these hearings, Rubin again testified for the State. She explained that she had been assigned to respondent's case between January and May 2024. She testified that she prepared the service plan dated March 18, 2024, which included parenting, mental health/psychological evaluation, housing, income, and domestic violence. She explained that this service plan was based on a review of respondent's performance over the preceding six months. Rubin reiterated the testimony she had given at the previous hearing, stating that while respondent had completed his original parenting services in 2021 and was rated satisfactory on that portion, the results of his psychological evaluation—which included a parenting capacity portion—showed that he would benefit from having one-on-one parent coaching. She further stated that respondent was rated satisfactory on domestic violence services.

¶ 44    Regarding housing, Rubin testified that respondent's new living situation did not pass an inspection in February 2024, and he was therefore unsatisfactory on housing, which also prevented him from being allowed to have visitation with the minor at his home. Rubin talked with respondent that month and told him what he needed to do in the next 30 days in order to pass a housing inspection. When she returned at the end of March, he had made "significant changes," he passed inspection, and visits began being held at his home. Rubin next testified that respondent was unsatisfactory on the requirement of maintaining a steady income at the time. He had recently been released from his last job after two weeks of employment at the start of 2024; those two weeks were the only time that he was employed during the approximately eight months in which she was his caseworker. Rubin also explained that the stable income requirement needed to be maintained for a six-month period in order to be satisfactory.

¶ 45    Rubin further stated that, in the six months leading up to the March 2024 service plan, respondent was unsatisfactory on mental health, as he failed to reengage in counseling and parenting services as per the psychological evaluation. She described this as a barrier to returning the minor to respondent's home. Rubin also testified that she had observed some of respondent's visits with the minor, and she recalled that while respondent did well with engaging with her, the minor would sometimes blow up at him and act upset. But she observed respondent playing games with her, giving her snacks, and parenting her when she became upset.

¶ 46    Rubin stated that respondent was not consistent with his weekly visits; when she started on his case, they were very sporadic, occurring only around once or twice a month. Sometimes, respondent would call in to confirm an upcoming visit, but then call to cancel it the next morning; other times, he simply did not show up. She stated that he "always [had] an excuse," blaming his absences on illness, oversleeping, and the like. Rubin further testified that she had spoken with respondent about his unsatisfactory services on multiple occasions, and he would always tell her that he was going to do it; this went on for over a year without respondent making any progress on the outstanding services.

¶ 47    On cross-examination, Rubin acknowledged that there had been one time when respondent cancelled visitation because he called in sick, and that illness was a valid reason for a cancellation. Respondent's counsel further challenged Rubin's testimony that respondent only made one or two visits a month during her time on the case, reviewing with her the court reports filed by Caritas during that period. Rubin acknowledged that, between January and May of 2024, respondent attended 14 out of 20 visits; that for 3 of the 6 missed visits, respondent reported that either he or someone in his household was sick. She also explained that respondent never asked for his visitation to be increased from more than an hour a week, until the end of her time on his case. At

16

that point, the matter was proceeding to the present termination hearing, and Rubin told him that the conversation would have to wait for the termination proceedings to be resolved.

¶ 48    Rubin also recognized on cross-examination that the agency had never attempted to remove either of respondent's other two children while they were living with him. However, she explained that the recommendation for him to receive additional parenting education came from the agency's concern about how long his case had been pending and, consequently, how long ago he had completed his original parenting classes; furthermore, by the time that this recommendation was made, respondent was living with his younger child (and would later be living with two children, once the second was born), which also factored into the agency's concern. Respondent's counsel asked whether the additional parenting services were to correct a deficiency in his parenting, or simply improve his already-satisfactory skills. Rubin replied that there was a deficiency stemming from the fact that respondent was parenting additional children, and Caritas had not observed him visiting with and parenting the minor alongside two younger children.

¶ 49    Next, Kylie Michael, a foster care case manager with Caritas, testified for the State. She testified that she was assigned to the minor's case from May to December 2023, and initiated respondent's October 10, 2023, service plan.She testified that while respondent did have housing during this time, there was concern over the entire space being "very cluttered" with various items, and the fact that the minor would have to share a bedroom with her half-brother. Ultimately, respondent was rated unsatisfactory on housing because he failed to provide a lease. She stated that respondent was employed when she came onto his case and had provided paystubs in February 2023; however, he had a new employer by the time of his next service plan review and had not informed the agency of this change.

17

¶ 50    Regarding his psychological evaluation, Michael testified that once the results from the evaluation came in, respondent's required services included cooperation with all of the recommendations given during the evaluation. Michael rated him unsatisfactory during her service plan review because he had failed to follow through with these recommendations. He did not take his prescribed psychiatric medication, he did not attend the additional one-on-one parent coaching, and he did not reengage in therapy in the approximately five to six months between the results of his evaluation and Michael's reassignment from his case.

¶ 51    Regarding visitation during her time on his case, Michael testified that the minor sometimes did not want to attend; she would kick and scream and not want to get into the car to go to the CASA offices where respondent's visitation took place. She further stated that respondent had asked about increasing visitation time at some point, but the agency could not increase his time because he still had some unsatisfactory services on his plan—specifically, the services that came from the psychological evaluation's recommendations.

¶ 52    Cindy Bushue also testified for the State. She explained that she was a case assistant at Caritas, who supervised parent-child visits. She was assigned to respondent's case from June to September 2021, and from June 2023 to June 2024. Bushue testified that between June 2023 and June 2024, respondent cancelled approximately 29 out of 52 visits, although not all of the cancellations were through any fault of his. She described the visits as going well and stated that respondent played with the minor the whole time. If respondent's two younger children were present, the minor interacted with them as well.

¶ 53    Bushue recalled that the minor's behavior during visits was good, although there were times when Bushue came to pick her up for visits that she did not want to go, and would run away and hide. She did not tell Bushue why she did not want to go. Bushue testified that the minor would

18

sometimes make comments about how respondent was her "real dad," but her foster parents "are [her] mom and dad." She also sometimes exhibited behavioral issues after visits that were not present before visits, such as dumping her snack and drink onto the floor of the car on the drive back.

¶ 54    Regarding visitation, Bushue testified that respondent generally missed around half of his visits during her time on his case, although between August and October of 2023, he missed the majority of his visits. She said that illness was only one of the reasons he would give for missing visits; there were times when he missed visits because he failed to call and confirm or did not show up.

¶ 55    The last witness for the State was Jennifer Hoene, a Caritas foster care case supervisor assigned to respondent's case from April 25, 2023, through September 25, 2023. She testified that during her time on the case, respondent was rated unsatisfactory on his service plan overall, and his visitation attendance was inconsistent throughout, which prevented any increase in his visitation. On housing specifically, he was rated unsatisfactory because his housing situation was not consistent over a six-month period. This was because his girlfriend notified his caseworker that he had moved out of their apartment in July 2023. Respondent also never provided a lease for his housing during Hoene's time on the case.

¶ 56    She also stated that respondent was unsatisfactory on mental health services during her time supervising. He did not reengage in mental health counseling at any point, and this was required before the minor could be returned to his home because "we would want a parent to be able to develop coping skills for their own mental health trauma and work through that prior to returning a child." Relatedly, the one-on-one parent coaching was required because respondent needed to develop skills to parent the minor, as "the bond between them *** was lacking." Hoene

19

stated that respondent told her in 2023 that he did not want to engage in any more services. However, neither he nor his counsel made any efforts to change or remove those services from his service plan. As he failed to complete the mental health and parenting services recommended by his psychological evaluation, he was rated unsatisfactory on these service plan requirements during her involvement with the case.

¶ 57    On cross-examination, Hoene acknowledged that she had not had any personal interaction with respondent, and her knowledge of his performance on his service plan came from case notes. She also explained that the reason for adding the additional counseling requirement to respondent's plan despite his successful discharge from his original mental health services because his history of trauma that was noted in his psychological evaluation had not been addressed in the counseling he had completed.

¶ 58    Respondent also testified, stating that he was not currently employed and had been out of work for approximately three months. However, he said he had been employed during the period between May 2023 and February 2024. He stated that, following his psychological evaluation, he was told that the additional services were recommendations and he did not need to do anything further; however, Caritas elevated the recommendations to requirements. He further testified that, throughout the course of his case, his visits with the minor would regularly be cancelled with little notice by the agency due to an issue with either the agency or the foster family.

¶ 59    Respondent also testified that he did not refuse to do the additional services; he instead said he wanted to wait until after the next court hearing. He said that he loved his daughter and that he had asked multiple times to have his visitation increased from one hour per week. When asked about missing approximately half of his visits between June 2023 and June 2024, he stated that there was a lot of illness in his household; in particular, his son has a medical condition that leaves

20

him immunocompromised and frequently sick. While he sometimes called off of work to make an appointment, there were other times when he had to cancel visits because of work.

¶ 60    Respondent also testified that he had an appointment set up for the following week for one-on-one parenting services. He said that he was originally told that the parenting and further counseling services were only recommendations, and so he did not immediately engage in those services; Caritas later told him he was required to complete them. He acknowledged that he had not been discharged from mental health services to date. Regarding his inconsistent job history, he testified that there were several different reasons for the various times he lost a job, and that he was to blame in some of those instances.

¶ 61    The last witness to testify was Sarah Stock, the minor's foster mother. She stated that the minor had been living with her, her husband, and their three sons for almost five years and three months, since she was seven months old. She explained that she did not personally attend respondent's visitation, apart from attending virtual visits during COVID. Based on her recollections and the log she kept of the minor's visits with respondent, she testified that respondent attended approximately 50% of visits between May 15, 2023, and February 15, 2024. She referred to her notes and then added that he attended 19 out of 38 visits during that time period. She recalled only two instances during that time in which visits were changed or cancelled because of a conflict with her family—when they took their yearly vacation, and on one other occasion. Over the approximately five years in which she had fostered the minor, she said that the schedule of visits changed frequently, and she was told that it was to accommodate respondent's schedule.

¶ 62    Stock also testified that respondent could communicate with her through an app called Messenger Kids, which the agency set up to allow respondent to communicate with her about how the minor was doing, ask any questions about the minor, send and receive photos or videos, and

so on. She stated, however, that respondent had not communicated with her through the app "for a good year"; prior to that, he reached out "once or twice a year maybe." She further testified that respondent occasionally brought the minor gifts when he visited; over the past five years, she estimated that he brought two or three gifts, and he did not always bring her a gift on her birthday.

¶ 63 Stock said she encouraged the minor to attend visits, but she sometimes refused, and Stock was "not going to put her in a car seat if she's kicking and screaming." Stock tried not to let the minor know about an upcoming visit too far in advance, because this would cause her behaviors to worsen. After visits, Stock said it typically took a couple of days to "get her back down, *** [and] regulated." She specified that the behaviors in question included tantrums, not following rules, and severe diarrhea that her doctor attributed to anxiety. She added that the minor's teachers and daycare providers also noticed and mentioned these behaviors. Stock testified that the minor had only started declining to go to visits over the past two months; however, the changes in her behavior surrounding visits first started when she was approximately three and a half or four years old.

¶ 64 The circuit court took the matter under advisement, and issued a written order on March 19, 2025. The court found that the State had proven all three of its allegations by clear and convincing evidence, namely: (1) that respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare pursuant to section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2024)); (2) that respondent failed to make reasonable efforts to correct the conditions that were the basis for the minor's removal pursuant to section 1(D)(m)(i) of the Adoption Act (*id.* § 1(D)(m)(i)) during the nine-month period from May 15, 2023, to February 15, 2024; and (3) that respondent failed to make reasonable progress towards the return

22

of the minor pursuant to section 1(D)(m)(ii) of the Adoption Act (*id.* § 1(D)(m)(ii)) during the same period.

¶ 65     In support of its ruling, the court explained that respondent had missed multiple visits throughout the duration of the case—some justified, and some not. Notably, Bushue testified that respondent missed 29 out of 52 visits between June 2023 and June 2024, and while several of those missed visits were excused, others were no-call, no-show visits. However, the court acknowledged that Bushue testified that the visits which took place went well. The court also noted that it was unrebutted that respondent could reach out to Stock through the Messenger Kids app to communicate about the minor, and he failed to do so for a year. The court stated that a "truly concerned parent would be taking advantage of that ability at least on a weekly basis." The minor had been in care for at least four years during the relevant time period, and respondent was well aware of what he had to do at this point—thus, the court stated that his unexcused missed visits and failure to ask after the minor demonstrated a failure to maintain a reasonable degree of interest or concern for the minor's welfare.

¶ 66     Next, the circuit court recognized that respondent had met many of the goals of his service plan over the course of the case. The court further explained that it was unclear whether the one-on-one parenting coaching was a required service or an optional recommendation; it was also unclear to the court whether respondent had been referred to a provider for that service. The court concluded that it "will not consider this initial non-compliance against" respondent.

¶ 67     However, the court found that the State met its burden of proving a lack of reasonable effort based on his unsatisfactory performance on the income and housing provisions of his service plan. The court wrote that respondent's employment during the relevant time period was sporadic, and he was frequently unemployed. While he testified that he lost one job due to his visitation schedule,

23

he admitted that he was at fault for losing other jobs. Respondent also failed to maintain suitable housing during part of the nine-month period, as his home failed to pass a home safety inspection due to cleanliness. The court found that this could not be attributed to a lack of finances, and that "[f]ailing to maintain a residence to pass the very low cleanliness standards of DCFS clearly illustrates that [respondent] did not make reasonable efforts."

¶ 68 Lastly, the circuit court noted that the minor had been in care for at least three years past adjudication by the time of the nine-month period at issue. By that point, while respondent had made "some progress," the court found that "he still was not meeting the most basic requirements." This was evidenced by his failure to maintain employment, where no evidence suggested that employment was unavailable to him, as well as his failure to maintain his housing "in a minimally clean and safe manner." The court concluded that respondent was "nowhere near the return of the child" during the nine months in question. The matter then proceeded to a best-interest hearing.

¶ 69 E. Best-Interest Hearing

¶ 70 In advance of the best-interest hearing, CASA filed a report on April 21, 2025, writing that the minor had a strong bond with her foster family and felt that they were her family. Caritas filed a report on May 6, 2025, noting that the minor had been in her foster home since she was seven months old, and she was loved by and bonded with the family. The report stated that the foster parents reported that the minor was starting to refuse to attend visits with respondent, and the visits continued to be hard on her. The minor was up to date on all of her medical appointments and had no health concerns. She was attending kindergarten and signed up for t-ball in the summer. The minor was well cared for, and the foster parents wished for her to have permanency.

¶ 71 The circuit court held a best-interest hearing on May 14, 2025. The State's first witness was Chloe Chestnut, a caseworker at Caritas who was assigned to the minor in mid-March of 2025.

24

She had reviewed the notes of previous caseworkers and had observed the minor in her foster home on one occasion. From Chestnut's observations, the minor seemed comfortable in the home, her needs were being met, and the family loved her. Chestnut testified that the minor was bonded with her foster family. Chestnut had the opportunity to speak with the minor, but the child did not express anything about her own desires. Chestnut also reported that the foster parents told her they were willing to adopt the minor.

¶ 72    From her observance of the home, Chestnut had no concerns. She stated that the minor had her own room, filled with toys and other appropriate items. The minor's demeanor was shy but happy. She seemed comfortable with her foster family. While Chestnut did not hear how the minor referred to her foster mother, she knew from the case notes that the minor called her "mom."

¶ 73    Chestnut further testified that the almost six-year-old minor had been in her current foster placement since she was seven months old—for the majority of her life. The minor had recently started refusing to go to visits with respondent. She would tell the case aide who came to pick her up that she wanted to go home to her mom. Chestnut opined that it would be in the minor's best interest for her to remain in her current placement.

¶ 74    The State next called Carrie Wharton, the CASA advocate for the minor. She testified that she had known the minor for four years, visited her once a month, and had observed her with her foster family. Her testimony was similar to Chestnut's regarding the minor's room, the conditions of the home, her comfort with the family, and the love and bond between them. She also noted that the minor called her foster parents "mom" and "dad." Wharton believed that the family was meeting all of her needs. While the minor had not verbalized her wishes directly, Wharton testified that she had seen drawings the minor had made of her family, which included the foster parents'

25

sons, whom she called "brothers." She also wrote, "I love you." Wharton added that the boys and the minor interacted with each other like siblings.

¶ 75    On cross-examination, Wharton stated that the only time she observed the minor mention respondent, she said she "didn't have fun" at her last visit. She also explained that the primary sources of her testimony were her interactions with the minor and the foster mother. Wharton had no concerns regarding the minor's placement and believed it to be in the minor's best interest to remain with her foster family. Furthermore, the foster parents were willing to adopt.

¶ 76    Sarah Stock also testified at the best-interest hearing. She confirmed that the minor had been living with her family for approximately five and a half years, or most of her life. She, like Wharton, testified that the minor and her three biological sons played and argued just like siblings. She testified that the minor appeared comfortable in her home and bonded with her family. The minor referred to Stock as "mom" and sought her or her husband out for comfort when she was upset. Stock affirmed that she was willing to adopt the minor if respondent's parental rights were terminated, and that the rest of the family agreed. She added that she and her husband were employed, each child had their own room in the home, and the minor had a variety of age-appropriate toys. Stock testified that the minor was doing well in kindergarten, had friends in school, and was enjoying playing t-ball as an extracurricular activity.

¶ 77    Respondent testified that he lived in an apartment with his girlfriend and their two children, and he described his son's complex medical needs. He stated that he had had a number of jobs throughout the pendency of the case and had been employed for six months at his current job. He explained that he had visits with the minor for one hour per week, which started in the agency's offices but eventually moved to his home; he added that the visitation schedule caused him to lose one job. He testified that he had asked caseworkers to have his visitation increased and was told

26

they would "look into it"; however, his visitation was never increased. He added that he had recently been cut off from visitation due to the minor's occasional refusal to attend.

¶ 78 Respondent testified that when the minor visited his home, she seemed to enjoy her time with him, and she interacted with her half-siblings, notably with respondent's younger daughter, whom she "adores." Respondent affirmed that he wished to have a relationship with the minor and that he loved her. He stated that caseworkers had suggested to him at points that he should surrender his parental rights to the minor, but he wished to "keep fighting" instead. Respondent further stated that he did not struggle with sobriety or abuse any substances. He explained that the loss of his parental rights would affect the whole family. It would sever the connection he and the minor had with one another and would upset his other children—his son had started acting out because he missed his sister and wanted to see her.

¶ 79 On cross-examination, he acknowledged that he had no reason to believe that the minor's foster placement was inappropriate for her, or that her foster parents were bad to her in any way. As far as he was aware, the minor was thriving in her foster placement. He also stated that he had never had any problems with the Stocks. However, he stated that the minor referred to him as "the real dad" and her foster father as "fake dad." After closing arguments, the circuit court took the matter under advisement.

¶ 80 The court entered an order as to the minor's best interest on May 27, 2025. The court wrote that it had reviewed the evidence and arguments presented, and considered the statutory factors found in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2024)). The court referenced the minor's age and how long she had been in the Stocks' care. It noted that the evidence clearly showed that the minor was bonded with the family, was safe and secure in their

27

home, and had all of her needs met. She considered the Stocks to be her parents and brothers, respectively, and there was mutual love between her and the family.

¶ 81    The minor had her own room, toys, and clothes, was doing well in school, was making friends, and took part in activities. While there was no evidence presented regarding her long-term wishes, the evidence demonstrated that she was happy in her placement. Furthermore, the Stocks were willing to adopt her and clearly had the means to support her.

¶ 82    The court also noted that respondent clearly loved the minor and wanted her returned to his home. He also acknowledged that the foster parents never impeded his relationship with the minor. While the court recognized that the GAL had not observed respondent with the minor, it noted that she had observed the minor interacting with her foster mother, and the GAL agreed with the State that it was in the minor's best interest that she remain with the Stocks, and that respondent's parental rights be terminated. The circuit court agreed as well and ordered that the respondent's parental rights over the minor were terminated. This appeal followed.

¶ 83                                    II. ANALYSIS

¶ 84    On appeal, respondent argues that the circuit court's findings that he was an unfit parent and that his parental rights should be terminated were against the manifest weight of the evidence. For the following reasons, we reject both contentions.

¶ 85                      A. The Circuit Court's Finding of Unfitness

¶ 86    A parent's right to raise his or her child is a fundamental right, which a court may not terminate without the parent's consent except as authorized by statute. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). A court's statutory authority to involuntarily terminate parental rights is governed by the Juvenile Court Act and the Adoption Act. *Id.* Pursuant to the Juvenile Court Act, the involuntary termination of parental rights requires a two-step process. *In re Donald A.G.*, 221

28

Ill. 2d 234, 244 (2006). First, the court must determine, by clear and convincing evidence, that the parent is an "unfit person" as defined by section 1(D) of the Adoption Act. *Id.*; 705 ILCS 405/2-29(2) (West 2024); 750 ILCS 50/1(D) (West 2024). If the court makes a finding of unfitness, it next considers whether termination of the parent's rights is in the best interests of the child. *In re Donald A.G.*, 221 Ill. 2d at 244; 705 ILCS 405/2-29(2) (West 2024).

¶ 87    As applicable to the underlying case, the Adoption Act defines an "unfit person" as:

> "D. 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following ***:
> * * *
> (m) Failure by a parent (i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987 or dependent minor under Section 2-4 of that Act, or (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor ***." 750 ILCS 50/1(D)(m)(i), (ii) (West 2024).

¶ 88    Under the Adoption Act, "reasonable effort" is "a subjective standard and refers to the amount of effort reasonable for the particular parent." *In re P.S.*, 2021 IL App (5th) 210027, ¶ 34. The court must determine "whether the parent has made earnest and conscientious strides toward correcting the conditions that led to the removal of the minor from the home." *Id.*

¶ 89    "Reasonable progress," by contrast, is determined by an objective standard, which is based upon the amount of progress measured from the conditions existing at the time custody was revoked. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 47. The Adoption Act provides guidance for measuring reasonable progress as follows:

> "If a service plan has been established *** to correct the conditions that were the basis for the removal of the child from the parent and if those services were available, then, for purposes of this Act, 'failure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan ***." 750 ILCS 50/1(D)(m)(ii) (West 2024).

29

See also *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17 ("The benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." (citing *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001))).

¶ 90    In reviewing a court's findings that a parent is unfit and that terminating parental rights is in the best interest of the child, we do not retry the case; rather, we must determine if the findings are against the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. The lower court's finding of unfitness is afforded great deference because that court was best positioned to view and evaluate the parties and their testimony. *Id.* Accordingly, on appeal, we will not reweigh the evidence or reassess the credibility of the witnesses. *Id.* A decision is contrary to the manifest weight of the evidence "if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *Id.*

¶ 91    Here, the circuit court found that respondent failed to make either reasonable efforts or reasonable progress. Respondent argues that the State failed to prove reasonable progress because none of the service plans filed with the court were signed by respondent and there was no testimony establishing when—or if—respondent was ever given copies of the plans or had the requirements explained to him. He further alleges that all of his plans over the course of the case were "copy-pasted reiterations of the same demands," without either consideration for respondent's individual circumstances or acknowledgement of the work he had already done at any point. Thus, he argues, the service plans were not tailored to remedying the conditions that brought the minor into care. In addition, while he admits that his compliance was "mixed," he contends that he did participate

30

in services, but every service plan "mechanically rated his progress 'unsatisfactory,' " without offering any detailed documentation supporting these conclusions. He therefore argues that the court prioritized the ratings over the evidence of his actual progress.

¶ 92 We initially note that we give deference to the circuit court's determination regarding the credibility of respondent and the State's witnesses. The circuit court had the opportunity to observe them at the hearings and is therefore best positioned to weigh conflicting evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31.

¶ 93 Secondly, the question on appeal is not whether respondent made *any* progress, but rather, whether he made *reasonable* progress. Indeed, the circuit court recognized that respondent had taken some steps towards correcting the conditions that led to the minor's removal. The court noted that some of his missed visits were for valid reasons, and the visits that he did attend went well. The court further acknowledged that respondent had met many of his service plan goals over the course of the case and specifically stated that it was not basing its unfitness finding on his failure to complete the additional one-on-one parenting coaching that may or may not have been a service plan requirement.

¶ 94 However, the court also found that respondent failed to progress on his income and housing requirements and failed to show an interest in the minor based on his inconsistent visitation attendance and his lack of communication with her foster mother. Respondent admitted that he was at fault for some of his job terminations, and there was uncontroverted evidence that several of his missed visits were not for excusable reasons such as illness. The court also found that there was no excuse for his failure to maintain his home to pass DCFS's housing inspection. Ultimately, the court found that his progress during the nine-month period from May 15, 2023, to February

31

15, 2024, was objectively insufficient to return the minor to his custody. See *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17.

¶ 95 In rendering its ruling, the circuit court also found that respondent was aware of his service plan requirements. We agree. Contrary to his argument on appeal, multiple State witnesses testified that they discussed his service plan with him at various points. Furthermore, respondent himself testified about his efforts and progress in his services, indicating that he was aware of the contents of his service plans. The court even agreed with him on one point of uncertainty—namely, the nature of the parenting recommendation stemming from his psychological evaluation—and did not weigh it against him in its decision. However, the court was not required to find that respondent made *no* progress in order for it to determine that the progress he did make was not reasonable.

¶ 96 We further disagree with respondent's contention that his service plans were not tailored to him and to the circumstances that led to the minor's removal. She was removed from his home due to neglect resulting in her failure to thrive. Respondent's services included parenting classes, suitable and stable housing, and a sufficient income to meet her needs—all of these are directly relevant to correcting this issue. Respondent admitted to having a history of mental health concerns and not only were mental health services part of his plan, but the particular requirements for those services changed to specifically address respondent's individual mental health needs. Service plans may also change to reflect conditions that come to light later in the case.

¶ 97 Furthermore, the fact that the same services appeared on multiple iterations of respondent's service plan does not mean, as respondent suggests, that the agency was producing boilerplate plans without giving any attention to the work he had done. Indeed, there were multiple reports filed with the court that detailed his progress—*inter alia*, in completing parenting and domestic violence courses, being satisfactorily discharged from his initial counseling requirement, and

32

behaving appropriately at visitation when he managed to attend. However, the reports also provided explanations for any unsatisfactory ratings, and the court also heard testimony from various caseworkers explaining these ratings. Additionally, the focus of the court's unfitness finding was limited to the nine-month period from May 15, 2023, to February 15, 2024; his prior progress does not negate his shortcomings within the relevant time period.

¶ 98    In light of the above, we hold that the circuit court's determination that respondent's progress was not objectively reasonable was not against the manifest weight of the evidence. As previously stated, a decision is against the manifest weight of the evidence when the opposite conclusion is apparent or the court's findings are unreasonable, arbitrary, or not based on the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. Thus, we need not go so far as to review the record for any evidence indicating that respondent made *some* progress—it is clear that he did. However, the circuit court's conclusion that this progress was insufficient is neither arbitrary and unreasonable, nor lacking in evidentiary support.

¶ 99    Next, respondent argues that the circuit court erred in finding that he did not make reasonable efforts because the State presented no evidence that: (1) any caseworker ever told him that he was noncompliant on his services or gave him an opportunity to correct course; or (2) DCFS timely referred or re-referred him to services when his engagement lapsed. We find that respondent's contentions are not supported by the record.

¶ 100   In determining that the State had met its burden of proving a lack of reasonable effort, the circuit court specifically referenced his lack of effort to find and maintain a job that would satisfy his service plan requirement of obtaining a steady and sufficient income to provide for the minor's needs. The court also referenced the DCFS housing inspection that he failed during the relevant time period, which Caritas case manager Michael testified was due to clutter, the agency's

33

preference that boys and girls have separate bedrooms, and respondent's failure to provide a lease. The Caritas witnesses who discussed conducting reviews on respondent's service plans testified that they communicated with him about his service requirements, and the reports filed with the court indicate that respondent was informed of the specific areas in which he needed to improve throughout the pendency of the case. Thus, the record contradicts respondent's argument on appeal that he was never made aware of any unsatisfactory performance, or of what he needed to do in order to be in compliance with his plan.

¶ 101   We therefore find that the circuit court's decision regarding reasonable efforts was not against the manifest weight of the evidence. Respondent testified about the lack of communication from DCFS and Caritas, and the caseworker testimony and court reports offered evidence suggesting otherwise. As previously stated, we will not disturb the circuit court's credibility determinations and the weight given to conflicting evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. Furthermore, the court admonished respondent at the February 8, 2023, hearing—a few months before the commencement of the nine-month period at issue—that he needed to cooperate with the agency by providing copies of his lease, paystubs, and all other documentation asked of him. Therefore, it was not arbitrary or unreasonable for the court to find that respondent failed to make reasonable efforts.

¶ 102 Respondent also argues that the fitness hearing was undermined by "procedural irregularities" because the circuit court recognized at the June 24, 2024, hearing that two service plans that fell within the relevant nine-month period were missing from the case file and had not been disclosed to respondent's counsel. Respondent therefore argues that his case improperly proceeded to a termination hearing without ensuring that he had been given timely access to his service plans.

34

¶ 103   This argument mischaracterizes the record. The circuit court stopped the termination hearing to allow time for the State to correct this oversight and file the missing reports, and to allow time for respondent and his attorney to review them. The hearing resumed some months later, on October 2, 2024. Furthermore, to the extent that respondent alleges that he was never made aware of his service plans during the time covered by these reports, we have already rejected his allegations that his service plan requirements were never adequately communicated to him above, and our conclusion applies here as well.

¶ 104   Lastly, respondent argues that the circuit court erred in finding him unfit by reason of "[f]ailure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare" pursuant to section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2024)). A finding of unfitness under this provision is based on a subjective analysis, which focuses not on the parent's success, but rather on the reasonableness of his efforts, taking into account his particular difficulties and circumstances. *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33. Simply demonstrating some interest in or affection towards the child does not render a parent fit under this subsection; rather, his interest, concern, and/or responsibility must be reasonable. *Id.* Furthermore, "[b]ecause the language of section 1(D)(b) is in the disjunctive, any of the three elements may be considered on its own as a sufficient basis for unfitness." *Id.* Unlike subsection (m), discussed above, subsection (b) has no time constraint that limits our consideration of respondent's fitness. *Id.* Both noncompliance with a service plan and infrequent or irregular visitation with the child have been held to be sufficient evidence warranting a finding of unfitness under this subsection. *Id.* (quoting *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24).

¶ 105   The circuit court found respondent to be unfit under this subsection based, in part, on Caritas case assistant Bushue's testimony that respondent missed 29 out of 52 visits between June

2023 and June 2024. The court found some of those absences to have been justified, but the remaining no-call, no-show visits were numerous enough to suggest a lack of interest or concern. The court noted, however, that respondent behaved appropriately during visits, and there was no evidence indicating that the child was in danger.

¶ 106   The circuit court also stated that there was unrebutted evidence presented of respondent's ability to reach out to the minor's foster mother through the Messenger Kids app to check in on or ask after the minor. There was also unrebutted evidence of respondent's failure to do so for the past year. The court found this to be another indicator of respondent's lack of interest or concern regarding the minor, as it noted that a "truly concerned parent" would be taking advantage of this opportunity frequently. Additionally, the circuit court noted that the minor had been in care for years, and respondent's visitation attendance remained inconsistent throughout the pendency of the case.

¶ 107   We find that the circuit court's ruling that respondent was unfit under subsection (b) was also not against the manifest weight of the evidence. The court recognized that respondent loved and cared for the minor—however, this cannot supplant a finding that he did not make reasonable efforts to maintain interest in and concern over her. See *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33. Furthermore, the court was presented with evidence that respondent did not comply with his service plan and missed many visits without a valid reason. Our courts have held that both of these factors may be bases for a finding of unfitness pursuant to section 1(D)(b) of the Adoption Act. *Id.*

¶ 108   In summary, the circuit court was able to review several service plans and agency reports, which detailed respondent's progress and efforts towards completing services, and heard testimony on the same from several Caritas workers. The circuit court also heard respondent's testimony and reviewed his exhibits and balanced the evidence supporting and contradicting a finding of

unfitness. The record shows that the circuit court's conclusion was not against the manifest weight of the evidence.

¶ 109                  B. The Circuit Court's Best-Interest Finding

¶ 110   Once the court makes a finding of unfitness, "[t]he issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The parent's interest in maintaining the parent-child relationship "must yield to the child's interest in a stable, loving home life." *Id.* At this stage of the termination proceedings, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31.

¶ 111   In making a best-interest determination, the court must consider, within the context of the child's age and developmental needs, the following factors:

> " '(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child.' " *Id.* ¶ 32 (quoting *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006)).

See also 705 ILCS 405/1-3(4.05) (West 2024).

¶ 112   As with the circuit court's findings at the unfitness stage, we afford the court great deference, as it is in a superior position to view the witnesses, assess their credibility, and weigh conflicting evidence. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33. We will not reverse the circuit court's best-interest determination unless it is against the manifest weight of the evidence. *Id.*

37

¶ 113 On appeal, respondent argues that the circuit court issued only a short, conclusory statement in ruling on the minor's best interest without analyzing the statutory factors and making explicit findings as to each factor. He further contends that the court relied on generalized testimony from caseworkers with no firsthand knowledge "of either the child's current home or the full scope of [respondent's] recent efforts." He adds that the GAL and caseworkers "consistently conceded" that respondent's visits were "appropriate and affectionate." We find that the record contradicts respondent's allegations.

¶ 114 At the best-interest portion of the termination proceedings, the circuit court heard uncontroverted evidence that the minor was safe and secure in the Stocks' home, had her needs met, was up to date on medical appointments, was doing well in school and extracurricular activities, was making friends, and otherwise thrived in her foster placement. She and the foster family loved each other and had a strong bond. She considered the Stocks to be her mom, dad, and brothers, and she turned to her foster parents when she needed comforting. The parents wished for her to have permanency, were willing to adopt her, and were financially able to provide for her. She had her own room in their home, with age-appropriate toys and clothing. While the minor was not able to vocalize her desires, caseworkers testified that she seemed happy with the Stocks.

¶ 115 Stock and the caseworkers also testified that the minor had started refusing to attend visits with respondent; respondent also acknowledged this to be the case. While it was undisputed that the minor did not seem to experience any problems during visits, Stock and witnesses from Caritas testified that she would fight to avoid visits beforehand and would display behavioral issues and signs of emotional distress after visits.

¶ 116 Furthermore, the minor had been living with the Stocks since she was seven months old, and she was about to turn six at the time of the best-interest hearing. She had been with them for

the majority of her life. See *In re S.L.*, 2014 IL 115424, ¶ 23 ("it is not in a child's best interest for his or her status to remain in limbo for extended periods of time"). Respondent also acknowledged that the foster parents never impeded his relationship with the minor. He also presented no evidence that the foster family was not a good placement for her in any way. The evidence showed that leaving her in the placement and allowing the Stocks to adopt her would be the least disruptive option for her.

¶ 117   We note that the circuit court recognized that respondent showed care and concern for the minor—that he loved her and wished for her to return to his home. However, the parent's desire to continue his parental role in the child's life is not a relevant factor at this stage. See *In re D.T.*, 212 Ill. 2d at 364. The circuit court did not err by not considering respondent's wishes, as that is not a factor in making a best-interest determination.

¶ 118   Furthermore, to the extent that respondent testified to any relevant best-interest factor, we repeat that the circuit court is afforded deference in weighing conflicting testimony and assessing witness credibility. As we have discussed, the circuit court was presented with clear, uncontroverted evidence on the relevant statutory factors establishing that it was in the minor's best interest to terminate respondent's parental rights, and we will not disturb this conclusion where nothing in the record indicates that it was unreasonable.

¶ 119   In light of the testimony presented at the best-interest hearing, we agree with the circuit court that the State met its burden of proving by a preponderance of the evidence that it was in the minor's best interest to terminate respondent's parental rights. We further find that the circuit court's determination was not against the manifest weight of the evidence where the evidence, as applied to the statutory factors, clearly supported termination.

¶ 120                                    III. CONCLUSION

¶ 121   For the above reasons stated, the circuit court did not err in finding that the respondent was

unfit and terminating respondent's parental rights. The orders of the circuit court are affirmed.

¶ 122   Affirmed.